The next case on the calendar is the United States v. Everson. Good morning, Your Honors. My name is Peter Tomeo. I represent the defendant appellant, Mr. Iverson. This is a case, Your Honor, that presents two unusual issues in which I think after a great deal of research, we found very little case law to help the court out on. I think the most important issue here is the constitutional issue regarding the Equal Protection Clause and the dismissal of a juror after the trial evidence closed by the judge on, frankly, an insufficient record. Didn't you waive that issue? I would—no, Your Honor. Not at all. In fact, the trial counsel specifically preserved it. Trial counsel, I mean, what I thought was the issue there was the fact that the district court made this decision ex parte, but on that, he asked, is it okay for me to do this ex parte, and the prosecutor said fine, and your client's lawyer said fine. Your Honor, respectfully, that this was to speak to the juror, not to take the ultimate action. The judge said, Judge Viado said to the parties, I think it would be best for me to speak to the juror on my own. He then—the parties agreed to that, and there was no objection. We're not objecting to the ex parte—it's not truly ex parte, but the contact with the juror out of the presence of the parties. What we do object to, Your Honor, and where the court erred, was taking it to the next step, because then what the judge did, he summarily dismissed the juror. He didn't come back and say to the parties, look, I had a discussion with this juror, and I think the best thing is to excuse him. I don't think he's qualified. No, he said—he came back and he said, he's gone. This juror's not here. The issue is over. And that issue was—and the objection was made at that point and preserved. And it's important, Your Honor, because— Well, I think that error—I mean, district court judges have broad discretion under Rule 24 to replace jurors. There was—the juror, he made a determination that he wasn't statutorily qualified. So you're really complaining about the fact simply that he didn't come back and say, this is what I've determined, and I've determined that I should disqualify the juror on this basis. Your Honor, yes, but the reason is— I mean, is it harmless in some sense? Because— It's not. I'm sorry, Your Honor. Explain why. Oh, it's not harmless, Your Honor. This is a constitutional issue. It goes to the—and all of our cases are constitutional, obviously. But it goes—I'm sorry, Your Honor. But it goes to the composition of the jury. This was a jury in which there were only two qualified jurors at the end. Okay. If a judge decides to dismiss a juror for cause, let's just say before, does the judge have to explain to the parties why, or can the judge just say, this is the situation, I dismiss this person for cause? No, he has to explain why. And this Court has directed district judges to make a record on that so you can review the reasons for why they would have to excuse the juror. But does—okay. So the Court says, I dismiss for cause for this reason. Do the parties then, they can object, but does their saying anything make any difference on that other than on whether there was cause? What I'm asking is, because, you know, it sounds to me as if what the judge did is after talking privately, decided the person was not qualified, and dismissed for the reason which he gave. But whether the parties were there or not at that point is hard for me to see makes any difference. I'd like to explain to you the difference it makes. Well, Your Honor, I think it makes a difference. Number one, it makes a difference. The fact that this is a Batson case makes a difference, and it changes the complexion of the case. Because it changes the racial makeup of the jury in a significant way. Number two, the judge did not find, based on that the juror, juror 16, said he was illiterate. In fact, the judge says he would not admit he was illiterate. I think at that point in time, if I had been the trial attorney, I would want to have explored that further. Literacy is not a binary thing, Your Honor. It's not you can read, you can't read, that's it. It's fluid as one of the authorities which I cited describes it. It goes from people like ourselves who have postgraduate degrees who read for a living to people who can't make out the letters in their own name. We're the ones who are illiterate. Well, maybe to our English professors, Your Honor, I don't know about that. But in any event, this is, if this, Mr. Iverson and his counsel should have had an opportunity to have that explored further, to find out what the limits of the literacy was. This was not a case in which literacy had anything to do with the substance. There was not a, in fact, this is the only time I've ever seen a federal case in over 40 years that there wasn't one piece of paper. There wasn't one lease or anything in here. There was no paperwork in this case. So this was not a situation where literacy played any role other than in terms of the qualification. And then the qualification is only he has to be sufficiently literate to be able to fill out the questionnaire. And he can have help filling out the questionnaire under the statute. The statute contemplates that somebody may help another individual fill out a questionnaire. So what we had here is a judge having found that there was no racially neutral reason for excusing a jury, a juror, now switching because he thought that the fellow may be illiterate without giving the defendant who's on trial here the opportunity. This didn't come out of the blue. This new decision didn't come out of the blue. Wasn't there some conversation between the juror's wife and the jury administrator? Well, the judge said there was some conversation. We don't even know the name of the jury administrator. We don't know the circumstances on which that happened other than the jury administrator saw somebody sitting in the gallery and thought it might be a juror and went and spoke to that person. And then that person said, I helped my husband fill out the form. Again, there's nothing wrong with her helping him fill out the form. The question is, did he understand enough of the form to be qualified? But then the judge questioned the juror in camera. And the judge reported back that he could not fill out the, he couldn't meet the qualifications of the statute. No, Your Honor. The judge, respectfully, the judge came back and he said that he had trouble reading, that he didn't want to admit he was illiterate. And the judge then made a conclusion that he was illiterate. There was no statement. And the judge... Your Honor, did he have any statement about his ability to deal with the questionnaire in conformity with the statute? We don't know what his limitation was. He said when he was... What did the court say when it reported its decision? When it came back, Your Honor, the judge said... Bear with me for one second. No, I have it. Where are you reading from? It's on page 172 of the appendix. I'm sorry, Your Honor, it's on page 214, 172 is the Batson ruling, 214. It says, it appeared to me that he really can't read or write and that it's not simply not reading and writing so well, it's that he doesn't want to admit he's illiterate. What does that mean, Your Honor? He has to... The standard is under the qualification is he has to be able to read and write enough to be able to fill out the form. He did not indicate that he was unable to fill out the form he indicated. If he had done that at voir dire and had said that, would you have an objection? If the juror had said he was illiterate? If on this same set of things, the district court had said, I excuse this juror for cause because I believe him to be essentially illiterate, and that had just happened on voir dire, what I'm trying to do is figure out how much your objection is to the ex parte and lack of coming back and how much it is to the merits of the decision that the court made. If I can, Your Honor, it's really to the fact that the judge acted in an arbitrary fashion by making the ruling without giving the parties a right to be heard and a right to see if there were additional questions that should be put to the witness, put to the juror. Now, if the juror had said to the judge, Judge, I can't read and write, period, at the end of the question, the judge had made that finding, then I think we'd have a different situation. If there had not been a Batson ruling, if this was . . . Well, you said a little bit more than the portion you focused on. I made an inquiry of the jury, the juror, and it turns out he cannot read and write. When I asked him, his answer was, not so well, and I said, well, did you fill out this form? He said, no, his wife filled out the form. I said, well, did she do it just because it was convenient for her to do it? He said, no, I can't do it. And then later on, on that same page that you were quoting from, he didn't fill out the form himself. The signature on the form was not his, and so I don't think we can continue with him. So it wasn't simply a statement that I believe he's unwilling to admit that he's illiterate. He had a conversation. You can argue that it maybe wasn't sufficient, but there were additional facts. Certainly, Your Honor, and it is in the record. I'm not trying to mislead the Court. I understand. That happens to be the section both parties quoted in their briefs that I pointed you to, and you went beyond that, which I understand. But the point is, Your Honor, that this was an issue, an important issue regarding the racial composition of the jury. There had been a Batson ruling, and then the judge himself went in the back, spoke to the juror without objection, and made a ruling based upon his findings without giving the parties an opportunity to be heard. And I think in that situation, it becomes a structural error. It went to the rights of the party. I don't think the—if I may just take a moment—I don't think the appellant has any obligation to show prejudice in that regard. I think prejudice can be presumed by the change in the racial composition of the jury by fifty percent. So in that case, Your Honor, the judge should have given him the opportunity to be heard. We don't know what would have come of that if he had been heard. And also, Your Honor, there was no contemporaneous record. This is the judge reporting later. This Court has suggested and instructed district judges that in these types of situations, it would be preferable to have a court reporter. And I think if we had a court reporter there, we'd be having a different discussion. Thank you, Your Honor. Do I still have my rebuttal? Yes. Thank you. Absolutely. We took more of your time. Any time. Good morning, and may it please the Court. Elizabeth Mollering, Assistant United States Attorney from the Western District of New York, representing the United States in this matter. This Court should uphold the district court's actions on both issues that are appealed here. First, the removal of the juror for being statutorily ineligible. And second, the police officer's actions as reasonable in bringing a dog to track a suspect after a 911 call about a man with a gun. Judge Livingston, you stole my thunder. I was going to read you the part of the record that you read right before I stood up, immediately before the quoted section, where the judge finds and says that the juror admitted in chambers that he couldn't fill out the juror questionnaire. The government does not see this. Isn't it true, though, that while the defense counsel and the government were both consented to proceeding by having the judge talk to the juror individually, that the defense counsel wasn't told by the court, I'm going to make a determination after I talk to him? That's true, Judge. I think a couple things about it. It's clear from the record that the government counsel and defense counsel agreed that the district court could question this juror in chambers. But wouldn't it have been better? I'm not saying that it's a matter that in this case was harmful or not. That's a different issue. But wouldn't it have been better if the district judge, after in chambers talking, reported that conversation and allowed the parties to speak to it, just as a matter of practice? I do think it would have been better. And I think that, Your Honors, this district court judge, this was his second criminal trial. I know the government attorneys assumed, now we know incorrectly, that a court reporter had gone into chambers to put the questioning on the record. And that that was an error that was not learned of until the transcripts were received for this appeal. But the district court came back and put his reasoning on the record and gave us a sufficient record of what was said in chambers, explaining why he made the determination he did. The quotes that Your Honor read earlier, where he gave the he said, then I said, then he said, gives us a record that lets us know what happened. And the other side of the coin there is that there's not even a factual dispute about whether or not this juror was statutorily qualified when the defense attorney at trial objected to the juror's removal at A215, he said, quote, I would like my objection on the record, judge, we knew during the voir dire that this individual could not read. So he's admitting that the statute, which to qualify jurors, where a juror must be able to read and write sufficiently to fill out the juror questionnaire, he's admitting that even he thought that this juror was unable and unqualified at the voir dire. I think this also would have been a different case, Judge Calabresi, as you mentioned, if the voir dire had been a little more voluminous on this topic. The judge had questioned the potential juror about his ability to read during voir dire. He had said he looked at magazines and could understand some of what he saw. And the judge, probably because he didn't want to embarrass the juror, did not delve further at the time. Which I think is unfortunate, because it would have likely been able to eliminate this problem earlier. I can also give a little insight into why the juror administrator had this conversation with the juror's wife. The juror's wife, who was there at voir dire and then after this juror was sat, appeared throughout the entire trial, was in the gallery the entire time. And it's maybe not uncommon for a member of the public to come and be interested if their spouse is sitting on a jury. But was sort of lurking in the hallways and was at one point trying to get into where the jurors go. And that's- Lurking is a dangerous word. Maybe not lurking, but was sort of walking about, looking for a door, and ran into the juror administrator. And that's what prompted the juror administrator to say, who are you and what are you looking for? I know that none of this is in the record. I can give this color as being part of the government that was involved with this case. But just so that you understand, it was a conversation in a hallway that then becomes put on the record that you're aware of. So I'd like to spend a little bit of time also on the other issue in assuming that my, go ahead. Let me just try to, is what you're saying essentially that there was an error, but that the error was harmless? Is that the thrust of your argument? Yes, Judge, absolutely. I think that the- I just want to be clear. The record should have, there should be a record made. The conversation and the removal of the juror should have been done on the record after they came out of chambers. But we would say that it's a harmless error as the juror was statutorily unqualified. And there's not a dispute in the government's view about his qualifications as all the parties agree he can't read. On the second issue, the issue of whether it was reasonable for Officer Costello and the other officers to bring a dog to the defendant's house when he called 911. The government's position is, first, it was incredibly reasonable for a dog to call 911 while reporting a man with a gun in an apartment hallway. When the officers with the dog approached the defendant's door, the door was ajar or open, according to the record. And they heard the defendant say, come in, it's open, or come in, officers. That's the two renditions we get from officers Iverson and Costello. Common sense indicates at that point that the invitation to come in extended to all the officers waiting at the door, both human and canine. Come in is a very broad invitation. There were multiple cops on the scene. We heard that police officers had said- Come in and include an invitation to a dog. If someone calls out and you say come in, do you expect a dog to enter your apartment? You might not expect it in the first instance, but I think it's reasonable considering the dog's attached to a- Haven't we said that insofar as dogs search, they're equipment, not people, and so an invitation to come in does not say you can come in with high tech equipment or other things. That doesn't, again, necessarily say, but the invitation isn't to the equipment, it's to the people. And this officer, Officer Costello, he's attached to the dog by a tether. He's the canine law enforcement officer. So by inviting him in, the defendant could see, there's testimony from the suppression hearing that there was nothing obstructing his view of seeing the dog walk in. I think this is more akin to the USV Reed case out of the Sixth Circuit or the State v Miller case out of North Carolina, where in both instances a police officer brought a dog to either a burglar alarm going off or a report of a break in at a house to track a suspect. That's the same reasoning here. They were trying to get a scent to track the person with the gun in the hallway. In both of those cases, law enforcement never gives a command for the dog to search for drugs, and that's similar here. If this had been some device that the officer happened to be carrying, and by activating the device, you could tell if the person had drugs in the apartment or was illegally hacking into somebody else's computer. It would clearly be a search, a warrantless search, and unreasonable if the device is activated once the officer goes in, even if he has consent, right? I think that's right, and I think there's a- Why doesn't that principle apply to bringing in the dog? Knowing that dogs are going to, a trained dog will alert to what he sniffs in the apartment. I think the difference is that here, police were lawfully present in the house, and they were invited in, including the dog, where if the police had had some sort of technology that they couldn't be seen, and they were using in the apartment to search for something else, I think it's a different case. Here, the police are invited in, they can look and see anything in their plain view. And in this instance, the sniff is sort of like the plain view for the dog. I think it is a different case if the police had instructed the dog to look for narcotics. But where the dog is there for a reasonable explanation to track a suspect with a gun after the defendant called 911. Does it matter if the equipment they come in with goes off on its own without it being turned on? That is, that it is an unwarranted search if you turn it on, but if it just goes off on its own, it's okay? I mean, basically, you're making a distinction between a dog who is told sick or whatever it is, point, and a dog who just automatically does it. Is that really the difference in which it turns? It's part of the difference, Your Honor, and I think the other part of it is, was it reasonable? Would it be reasonable for the police to have brought the equipment in the house, whether it's the dog or not? Here, it's reasonable for them to bring the dog because it's a tracking dog. There's no doubt that it was reasonable for them to have a dog with them when they were tracking. But in the house is what I think the chief judge is, the presiding judge is asking. I think it's a hard analogy to, I'm struggling with trying to find something else to analogize it to. But it's like if the police were wearing a radiation badge to protect themselves, to exposure to radiation. And they walked into an apartment and the radiation badge went off because the person had some sort of contraband that was radioactive. Would that be an illegal search and seizure? I would say, I know that's a different case than here, but possibly not because the radiation badge was to protect the officers. Not actually looking for radioactive material in the same way that the dog here was brought both to track a suspect and also there's testimony that he was brought for the safety of the officers. This was a canine law enforcement officer who brought their canine everywhere they went. And the district court made a factual finding that Officer Costello brought the dog to track the suspect and for no other reason. Yes. And there was also a factual finding that there was a clear line of sight. I think it's clear line of sight to tank when they entered his apartment and that the defendant made no objection to the entry. That's absolutely right. And for all those reasons, I see my time has expired. The government would ask this court to uphold the district court's findings, both on the juror removal issue and on the search and seizure. Thank you. Of course, your honors, I don't believe the prosecutor was proper here by going outside the record and talking about what happened just the way she made the argument and the brief about, well, there are really two forms when there's no evidence about two forms. This is the record on which a constitutional depredation, we argue, was shown. There was not, I take exception to the prosecutor saying there was no issue as to that the juror could not read. I think that that was shorthand. There was a discussion earlier on where he talked about problems reading and those issues came up in voir dire and they were not found to be significant. So I think- Right, and so, your honor, that's an important distinction there. I also note, your honor, in that section that you pointed us to where the judge says he made an inquiry of the jury, this is 1213, it turns out he cannot read or write. I asked him, his answer was not so well. So again, the judge is not making a finding that the juror, based on evidence, this is based on his subjective impression, which is why I believe there should have been an opportunity for the other, for counsel to have at least an opportunity to question. I've been in situations, I'm sure the trial judges have too, where the judge will come out and say, are there any more questions I should ask? Could you address the dog issue? Thank you, your honor, I would like very much because in this case, I'll be as succinct as possible. This is important, your honor. This is a case in which the government is definitely trying to get a precedent that they can use to say they can bring a dog into a house anytime they want and it's not an issue. I think the analogy to the radiation badge is misleading because that suggests protection. I would suggest, your honor, we all see the police officers walking around with their radios on their chest. If they had built into that radio some circuitry that would sniff drugs, I think we'd have no doubt that that was technology being brought in. And that the fact that it would show that there were drugs there and lead them to a further search would be a violation of the Fourth Amendment. This is the same thing, your honor. This dog, if there had been a- Saying it's two things. It is one for protection, but it is also a dog that one could conceive of a dog that was only for protection, and that would be no problem. But this dog was also a dog for protection who also could do the other thing. And would do it without command. And that's what the record shows. He did not have to have a command. Now, if Agent, I'm sorry, Officer Costello had ordered the dog to do it, well that would be another element to show that he had violated and intended to violate Fourth Amendment rights. Here, he could be passive. And your honor, also the argument that this was for protection is really misleading. The police put themselves into the house. There were three armed police officers. There was one man who had called the police. They didn't need the additional idea of the dog. He's not physically connected to him. He was on a tether. There were other officers there. Officer Costello didn't have to go in. He didn't engage in any questioning. He brought the dog in, your honor, for one purpose and one purpose only. I think the record's clear to see if there were drugs in that house. The district court found that your client, quote, had a clear line of sight to tank when they entered his apartment. Do you interpret that, I know we're bound by whatever is in the record, but is that a conclusion that your client could see the dog when he came into the apartment, saw the dog? There's the distinction. The judge found, and the testimony was, he should have had a clear line of sight. The officer said that he saw no reason why he wouldn't have seen the dog prior to the entry. I think the important thing is prior to the entry. Once the dog is in the house, I think the idea that now somebody- The dog didn't react right away once he went in the house. I don't think it was immediately. No, he didn't walk in and start barking, but there was- When he came in, your client could have said, could you please leave the dog, take the dog outside? He could have, but I don't think- I'm allergic to dog hair. And if he had been allergic, he probably would have said that. But this is somebody calling the police to protect him. He was calling the police because he believed there was somebody, an armed man, outside his house who meant to do him harm. He called the police. He asked him to come in. He didn't ask this dog to come in. And his testimony, Your Honor, that when that, what was this dog even doing there? The minute the police came, they came in force, as you'd expect them to come. And Officer Costello testified, the ground was so trampled, there was no way the dog was going to get a scent. There was nothing more of it. Your Honors, I think, and also when we look at the objective standard here of the police having a hunch that this black man in this neighborhood was selling drugs out of this apartment, there was no evidence of that. There was no suggestion of that. Turned out they found drugs, they found a gun, they found a few hundred dollars. But they had nothing at the point they entered that apartment to suggest that. They had no reason to bring that dog into the apartment, except, Your Honor, as a group. They had the purpose of trying to get what they did get, which was a dog strike. Thank you, Your Honor, and I appreciate the extra time. Thank you both, very well argued. Thank you.